IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 14, 2014

## STATE OF TENNESSEE v. JOSE LEMANUEL HALL, JR.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2012-D-3088    J. Randall Wyatt, Jr., Judge**

**No. M2013-02090-CCA-R3-CD   Filed - September 5, 2014**

The defendant, Jose Lemanual Hall, Jr., was convicted of first degree murder and especially aggravated robbery.  He received an effective sentence of life imprisonment with the possibility of parole.  On appeal, he challenges the sufficiency of the convicting evidence. Within that general challenge, he specifically contends that he was convicted solely on the uncorroborated testimony of an accomplice and an uncorroborated confession he made to a fellow inmate.  Following review, we conclude that both were sufficiently corroborated and properly considered in the sufficiency determination.  We further conclude that the evidence presented at trial was more than sufficient to support the conviction.  As such, we affirm. However, we remand for entry of corrected judgments of conviction reflecting the appropriate merger of the two murder convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed
and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and ROGER A. PAGE, JJ., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Jose Lemanuel Hall, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Procedural History

The convictions against the defendant arose from the robbery and murder of the

victim, Jeremy Green. The defendant and co-defendant Victor Johnson were indicted for one count of felony murder, one count of premeditated murder, and one count of especially aggravated robbery. Additionally, co-defendant Maurice Hegman was indicted on the charge of especially aggravated robbery in the same indictment.

On January 29, 2011, the victim, after working his shift at Wal-mart, returned to his apartment via the bus. The victim enjoyed music and had even converted the closet in his apartment to a small music studio. He wrote and sold "beats," the musical tracks to which rap lyrics were set. During the evening of January 29th, the victim spoke to several people on the telephone. Bianca Parker had a lengthy conversation with the victim, which ended around 10:00 p.m. when she received another call. Ms. Parker attempted to call the victim back after she was finished, but he did not answer the telephone. She attempted to make contact with the victim several more times during the evening and the following day; however, she did not actually speak to the victim again.

Jalisha Gleaves, who was dating the victim at the time, had spoken with the victim earlier in the evening, and they had plans for her to come to the victim's apartment to watch movies. She communicated to the victim that she was on her way when she left her home. She proceeded towars the victim's apartment, but she stopped at a Mapco gas station located very near the victim's apartment to purchase drinks. She attempted to call the victim while there, but she received no answer.

Ms. Gleaves then drove to the apartment complex and parked her car. She knocked on the victim's door, and the door pushed open. Upon entering the apartment, Ms. Gleaves witnessed the victim lying on the floor. She tried to roll the victim over, but when she observed blood, she stopped her attempts to aid the victim and called 911. However, she did not recall the actual address of the victim's apartment to give to police. While still on the phone with 911, she returned to the Mapco for assistance. No one there was aware of the address, but, upon exiting the store, a police officer on patrol arrived. Ms. Gleaves approached him, and the two returned to the apartment.

Upon re-entering the apartment, Ms. Gleaves noted that several of the victim's belongings, including an Xbox, a computer, audio equipment used in recording, and several plastic totes were missing. Demarco Keeler, a childhood friend of the victim, also verified that the Xbox 360, laptop computer, a microphone, and a music conversion box were missing from the apartment. Keeler informed the police that the victim's laptop user name was "Jay Dot."

Officer Gerry Hutcheson, the officer flagged down by Ms. Gleaves, entered the apartment and saw the victim lying on the floor. At the time, the victim was not breathing

and had no pulse. A crime scene investigator, Rhonda Evans, also responded to the scene that evening. During her search of the apartment, she found an empty Xbox box, an empty printer box, and an empty audio mixer box. However, none of the actual items were found in the apartment, only the boxes. Additionally, Investigator Evans found a laptop cord but found no laptop computer. She observed several pieces of black plastic near and under the victim's body. Outside in the dumpster area, she found a blue tote which contained items specifically connected to the victim, such as his high school diploma. She also found a damaged frying pan with a broken black plastic handle. Investigator Evans believed that the black pieces of plastic found near the victim were the remnants of the handle of the frying pan. The only usable prints found inside the apartment belonged to the victim and Demarco Keeler.

Additionally, the victim's cell phone was not found in his apartment. However, Ms. Parker, who had spoken with the victim earlier, was still trying to call the phone later that evening and into the next day. During one of those calls, the phone was answered by an unidentified male who stated that the victim had gone to a club the previous evening and would return her call later. The same male answered a second call from Ms. Parker and informed her that he was the victim's cousin from Atlanta. She also received a text message from the victim's phone, following his death, which read "5H2." Janae Grigsby, the victim's cousin, also began receiving telephone calls and coded text messages from the victim's phone at the same time. She reported this information to the police.

Police canvassed the area but could not find any witnesses who had seen or heard any disturbance in the victim's apartment. There was also no evidence of forced entry into the apartment.

Following the autopsy of the victim, it was determined that he died from "asphyxia by strangulation," which occurs within a matter of minutes rather than seconds. The examination also revealed hemorrhages in the victim's eyes which were consistent with asphyxiation. The victim's body had several abrasions and bruises on the forehead, neck, chest, and arms. Additionally, the victim's scalp had two large bruises, which the medical examiner opined could have been caused by a blow from the "bent up frying pan" found in the dumpster.

Detective Chad High was the lead detective in the victim's murder investigation. He responded to the murder scene and discovered that "it was obvious things were missing." He entered the serial numbers from the empty boxes found in the apartment into a system which allowed him to monitor if the items were ever pawned. The system would flag the item with the pawn shop when the transaction was made, and police would be alerted.

In the "early part of 2011," Lachrisha Poynter drove the defendant and co-defendant Hegman to a pawn shop. Ms. Poynter did not go inside the pawn shop with the two men. Victoria Holt, an employee of a shop then named "Household Pawn," identified a pawn ticket where the defendant had come in and pawned an Xbox at the store on February 21, 2011. His driver's license was recorded before the transaction was completed. Another employee of a different pawn shop also reported that the defendant pawned a laptop computer in that store on the same day. Videos were made of the transaction.

Based upon the investigation into the phone calls and texts officers learned were coming from the victim's phone following his death, police obtained the communication records for his cell phone. The decision was based in part on the following: (1) co-defendant Johnson's ex-girlfriend received a photo message from the victim's phone after his death which depicted co-defendant Johnson, the defendant, and others making gang hand signals; (2) the victim's phone received a call from the defendant's cell phone at 10:16 p.m. on the night of the murder; and (3) the victim's phone communicated with a cell phone tower in LaVergne at 2:09 a.m. on January 30, 2011. After learning more through his investigation, Detective High also obtained the communication records for co-defendant Hegman's and the defendant's cell phones. Mr. Hegman's phone made contact with a cell phone tower very near the victim's apartment three times just after 11:30 p.m. on the night of the murder. At 1:30 a.m., Mr. Hegman's phone communicated with a cell phone tower in LaVergne. The defendant's phone reflected no activity between 11:08 p.m. and 11:46 p.m. on the night of the murder. These "pings" were consistent with the path Mr. Hegman said the group traveled.

The investigation led police to speak with Mr. Hegman, who was eventually indicted along with co-defendant Johnson and the defendant, although only for especially aggravated robbery. The three were admitted members of the "5 Deuce Hoover Crips." Mr. Hegman noted that he had grown up with the victim in the "projects" and that he had even helped him move into his current apartment where the murder occurred. The two often played Xbox together, and Mr. Hegman related that the victim's user name was "Jay.Green." According to Mr. Hegman, he and his two co-defendants, along with two men named Antonio and Dominique, went to the victim's apartment around 11:00 p.m. or 12 a.m. on January 29-30, 2011, to "do music." According to Mr. Hegman, there was no discussion of a robbery occurring before they went to the apartment. He acknowledged a call was made to inform the victim that they were coming over.

When the group arrived, Antonio and Dominique elected to remain in the car, but the other three proceeded to the door of the victim's apartment. However, Mr. Hegman was not present at the door when it was actually opened, as he had returned to the car to find a CD for Antonio. When he did return to the doorway of the victim's apartment, it was open, and

he saw co-defendant Johnson and the victim fighting. At the time, the defendant was just standing there. Co-defendant Johnson told Mr. Hegman to take a blue tote from the apartment, and Mr. Hegman complied. As he picked up the tote, Mr. Hegman observed the defendant "reaching" towards the victim. He opined that the fighting might have been because the victim was wearing red, the color worn by a rival gang, although he did not know for certain.

Mr. Hegman returned to the car with the tote and waited. He observed co-defendant Johnson exit the apartment and walk to a nearby dumpster before returning to the car. Mr. Hegman began to drive away without the defendant, but the defendant managed to exit the apartment and return to the car before they left. Mr. Hegman stated there was no discussion of the events that had occurred in the apartment while they were in the car. At that point, Mr. Hegman drove Antonio and Dominique to their home, and the remaining three then drove to a friend's home in LaVergne. Mr. Hegman left the blue tote he had taken at this address. Mr. Hegman also acknowledged that he had Ms. Poyner take him and the defendant to some pawn shops at a later date. He also acknowledged that, following his arrest, he did not initially tell police the entire story. He also stated that he was not aware that the victim had been killed until he was informed so by the detectives.

Detective Chad Gish was a digital forensics detective who worked in the Metro Nashville Police Department. He analyzed the laptop recovered by police which had been pawned by the defendant. He discovered that the laptop had an operating system which had been installed on January 31, 2011, just two days after the victim's murder. Further analysis revealed that the previous operating system had utilized a user name of "Jay dot." Additionlly, a user name of "JeremyGreen" appeared under the old operating systems installation folder.

Based upon the above information gathered, the defendant was arrested and charged with felony murder, first degree premeditated murder, and especially aggravated robbery. While the defendant was in jail, Detective High monitored the defendant's letters and phone calls that he received at the jail. Several of the communications were encoded in "gang" terminology and script, which made interpreting the messages difficult. Apparently, when the defendant was first incarcerated, he blamed co-defendant Johnson for speaking with the police and getting them caught. However, as time progressed, he realized it was co-defendant Hegman who had actually given the police a statement. One of the letters stated, "they ain't got shit on me or cuzz [Mr. Hegman] all they got is pictures of me cuzz and lady in pawn shops pawning shit . . . . Baby tell cuzz that I'm putting everything on lil deuce [co-defendant Johnson]." In a separate letter, the defendant wrote, "fuck lil deuce, if he wouldn't have use that phone none of this would have happened." However, after receiving discovery, the defendant became aware that it was Mr. Hegman talking and sent a letter of apology to

co-defendant Johnson. In the letter, he noted that he had forwarded the information to other gang members that Mr. Hegman was a snitch, an extreme violation of gang code. He later wrote a letter to his girlfriend seemingly questioning why Mr. Hegman was still alive.

Following the severance of the defendants' cases the defendant proceeded to trial. All of the above information was testified to in the jury's presence. Additionally, Ronald Jones provided testimony. He was incarcerated with the defendant in March 2012. Mr. Jones testified that the defendant gave the following version of events regarding the robbery and murder of the victim:

> [He] told me that him and his Big Homie named Reese and another dude had went over there. They had been over there making raps, but this particular day they went over there to rob him and when they runned over there and knocked on the door, he, when dude opened up the door they rushed him and went in the apartment and once they got him in the apartment they wrestled with him and he said he put a choke hold on him and choked him out.

Mr. Jones also offered that the defendant had admitted taking "clothing and some electronics" from the apartment. According to Mr. Jones, the defendant said that he learned how to do the choke hold and to hide evidence in a forensics class he took at the University of Tennessee.

The defendant also acknowledged his gang membership to Mr. Jones. In fact, the defendant told Mr. Jones that he got his "status" after committing the murder of the victim. Mr. Jones contacted the district attorney after the defendant told him this information. Mr. Jones did acknowledge multiple prior convictions ranging from 1993 to 2011. He also acknowledged that, as part of a plea agreement, he received a lesser release eligibility date in exchange for his testimony.

Additionally, at trial, Mr. Hegman admitted on cross-examination that he had prior convictions for facilitation of aggravated robbery and a conviction as a felon in possession of a weapon. He acknowledged that he was not aware of what started the "tussling" between co-defendant Johnson and the victim, and it was possible that the victim actually started the fray. Mr. Hegman agreed that the defendant could have been reaching for the victim in order to assist co-defendant Johnson. He stated he simply did not know the particulars of what occurred. Moreover, Mr. Hegman made clear that part of the incentive to speak with the police was that he would avoid being charged with murder. He readily acknowledged his gang membership and admitted that he was the defendant's "big homie," a sort of mentor who outranks you and determines any increase in rank to be awarded.

The State also called Richard Littlehale as an expert in cell phone usage. He was employed as the Special Agent in Charge of Technical Services with the Tennessee Bureau of Investigation ("TBI"). He acknowledged that he did not know the exact mechanics of cell phone tower operation and that he had not personally inspected any of the towers utilized in the phone records for this case to see if they were functioning properly. In spite of the defense objection, the trial court allowed Agent Littlehale to testify as an expert in the field of cell phone analysis and criminal investigation. He proceeded to testify about the general operation of cell phones and the way in which the phones pinged off various towers, pinpointing a user's general location. He offered no testimony whatsoever that was specific to the facts of this case.

The State also called Detective Mark Anderson of the Metro Police Department as an expert in gang activity. He testified regarding the history of the 5 Deuce Hoover Crips and explained the "code" that the various gangs use. Detective Anderson explained the ranking system within the gang and possible ways to advance. He explained that he had explained this information to Detective High, the lead detective in the defendant's case.

At trial, the following stipulations were entered by the State and the defendant: (1) the only latent fingerprints found in the apartment belonged to the victim and Demarco Keeler; (2) no latent fingerprints were found belonging to Jalisha Gleaves, the defendant, co-defendant Johnson, or co-defendant Hegman; (3) the clothing of the victim was subjected to DNA analysis, and no DNA profile could be found other than that of the victim; (4) the accompanying letters were lawfully copied by a law enforcement agency that had a legitimate reason to do so and that the defendant was aware that his correspondence was subject to being monitored and/or copied by law enforcement; (5) the accompanying phone calls were lawfully recorded by a law enforcement agency and that the agency had a legitimate reason to do so and that the defendant was aware that his calls were being recorded and possibly monitored by law enforcement; and (6) the parties all agree that the defendant never attended college.

After hearing all the evidence presented, the jury convicted the defendant as charged in the indictment. The trial court merged the murder counts and set the case for sentencing. Following a hearing, the defendant was sentenced to life imprisonment for the murder and to twenty years for the robbery conviction. The court ordered that the sentences be served concurrently for an effective sentence of life imprisonment. Following the denial of his motion for new trial, the defendant filed the instant timely appeal with this court.

**Analysis**

On appeal, the defendant asserts that the evidence is insufficient to support his

convictions for murder and especially aggravated robbery. Within that general challenge, he alleges specifically that his convictions are based solely on the uncorroborated testimony of an accomplice, Mr. Hegman, coupled with the uncorroborated testimony relative to his alleged confession to Mr. Jones. He further contends that the testimony of Mr. Hegman cannot be used to corroborate the testimony of Mr. Jones and vice-versa. He asserts that because the testimony of the two is not corroborated, it cannot be considered in the sufficiency review, and that, without the evidence, there is simply no evidence to support his convictions. We conclude that the defendant's claims are wholly misplaced.

## A. Corroboration

Again, other than a generally asserted sufficiency challenge, the defendant's two specific challenges center around his assertions that he was convicted on the uncorroborated testimony of co-defendant Hegman and that there was insufficient corroboration of the alleged confession made by the defendant to Mr. Jones. While the defendant is correct that corroboration is required, his arguments are not meritorious in this case.

It is well-settled law in Tennessee that a criminal defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994), *superseded by statute on other grounds as stated in State v. Odom*, 137 S.W.3d 572, 580-81 (Tenn. 2004). The determination as to whether a witness is an accomplice may be a matter of law for the trial court's determinatiomn or it may be a question of fact for the jury's determination. *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992). When the facts are clear and undisputed concerning a witness's participation in the crime, whether he is an accomplice is a question of law for the court to decide. When the facts are in dispute or susceptible to different inferences, it becomes a question of fact for the jury. *Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975).

"An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). To satisfy the definition of an accomplice, it is not enough that the witness merely possessed guilty knowledge, is morally delinquent, or even participated in a distinct but related offense. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). The general test is whether the accomplice could be indicted for the offense charged against the defendant. *Id*.

The law in Tennessee regarding the corroboration required for accomplice testimony has been described as follows:

The rule simply stated, is that there must be some fact testified to, entirely

independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *Bigbee*, 885 S.W.2d at 803 (citations omitted)). Ultimately, it is a question for the jury to determine whether an accomplice's testimony has been sufficiently corroborated. *Pennington v. State*, 478 S.W.2d 892 (Tenn. Crim. App. 1971).

In this case, the trial court charged the jury as follows:

An accomplice is a person who joins another person in committing a crime. The accomplice must do so knowingly, voluntarily and sharing the intent of the other person in doing the crime.

In this case the Court charges you that the witness Maurice Hegman was an accomplice in the alleged crime. The testimony of an accomplice by itself cannot convict the defendant. The accomplice's testimony must be supported by other evidence. This other evidence must independently lead to the conclusion that a crime was committed and that the defendant was involved in it. This other supporting evidence must connect the defendant to the crime.

The supporting evidence may be direct or circumstantial and it need not be sufficient by itself to justify a conviction. The supporting evidence is enough if it fairly and legitimately tends to connect the defendant with the crime charged.

It is for you, the jury, to decide whether an accomplice's testimony has been sufficiently supported by the evidence.

We do agree with the defendant and the trial court that the record establishes that Mr. Hegman was in fact an accomplice in the commission of the crimes. He was charged with the other two defendants within the same indictment. The defendant contends that Mr. Hegman's testimony was not sufficiently corroborated because it is the only evidence which places the

defendant at the scene of the crime. In support of his argument, he points to the lack of any forensic evidence which places him at the scene. He also asserts that the testimony regarding the pinging of the defendant's phone is insufficient corroboration because there was no investigation to see if the towers were actually operational or had became overloaded on the evening on the murder. The defendant contends that the fact that he later pawned goods taken from the victim's apartment is sufficient only to establish that he was in possession of stolen property at a later date; a fact which he asserts does not corroborate Mr. Hegman's testimony. Finally, the defendant argues that the State cannot rely upon Mr. Jones'' testimony regarding the defendant's confession to him in order to corroboate Mr. Hegman's testimony because of Mr. Jones' lack of credibility based upon his extensive criminal past and because the confession is itself not corroborated.

With regard to the testimony of Mr. Jones, we do agree with the defendant that it in effect did amount to a confession by the defendant. The statement that "he put a choke hold on [the victim] and choked him out" does appear to be an acknowledgment of guilt, as is the admission of taking the property. We likewise agree that "[i]t is a well-established principle of law . . . that a conviction cannot be founded solely upon a defendant's confession . . . ." *State v. Bough*, 152 S.W.3d 453, 465 (Tenn. 2004). Rather, some corroborating evidence is required to establish the corpus delicti of the crime. *Id*. The defendant contends that the "record lacks any credible evidence corroborating what [Mr. Jones] states was 'confessed' to him. That coupled with the fact that it is entirely incredible that someone who was basically a perfect stranger . . . would confess an act of murder to another perfect stranger" does not support a finding of corroboration.

Our supreme court again recently addressed the issue of corroboration of a confession and the accompanying requirements. In *State v. Courtney Bishop*, 431 S.W.2d 22, ??, No. W2010-01207-SC-R11-CD, 2010 Tenn. LEXIS 189, **82-86, 88 (Tenn. Mar. 6, 2014), after a recitation of the historical significance and various rules, our supreme court affirmed Tennessee's adherence to a modified version of the "trustworthiness" standard. *Id*. at *82. The court stated that

> the modified trustworthiness standard strikes the proper balance. It combines the traditional *corpus delicti* rule's focus on avoiding prosecutions for nonexistent crimes with the trustworthiness standard's focus on avoiding prosecutions based on false confessions to actual crimes. Under the modified trustworthiness standard, a defendant's extrajudicial confession is sufficient to support a conviction only if the State introduces "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury.

*Id*. (citations omitted). The court then summarized the standard "in a nutshell:"

> When a defendant challenges the admission of his extrajudicial confession on lack-of corroboration grounds, the trial court should begin by asking whether the charged offense is one that involved a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworty, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

*Id*. at **83-84 (footnotes omitted).

In order to establish trustworthiness, the State must introduce independent evidence which corroborates the essential facts contained in the defendant's statement. *Id*. at **85-86. The court noted, for example, that independent corroboration of one key part of an extrajudicial confession or admission may serve to corroborate the entire statements. *Id*. at *86 (citations omitted). However, independent evidence which corroborates only collateral circumstances surrounding the confession will not suffice to establish trustworthiness. *Id*. at *87 (citations omitted).

The court continued by noting that one way to effectively bolster the defendant's admission or confession is to present independent evidence that "parallel[s] the defendant's confession" or corroborates the defendant's account of what happened immediately before or after the crime. *Id*. at * 88 (citations omitted). Another way for the State to bolster the confession is by presenting evidence showing that the statement reveals "specific personal knowledge about the crime." *Id*. at *89 (citations omitted).

Our supreme court noted that, once the State has presented independent evidence establishing the prima facie trustworthiness of the confession, the existence of contradictory evidence does not necessarily render the confession untrustworthy. Rather, the contradictory evidence instead raises a credibility issue to be determined by the factfinder. *Id*. at *90 (citations omitted). Further, additional extrajudicial confessions by the defendant are not sufficient by themselves to establish trustworthiness. *Id*. (citations omitted). However, a statement made under oath in open court requires no independent corroboration and may serve as corroboration of the extrajudicial statement. *Id*. at *91 (citations omitted).

The defendant's arguments with regard to Mr. Hegman's accomplice testimony and Mr. Jones's testimony regarding the defendant's confession specifically ignore that our

supreme court has recognized that accomplice testimony and a defendant's confession may corroborate one another. *Witham v. State*, 191 Tenn. 115, 121 (Tenn. 1950) ("The confessions were admissible in evidence to corroborate the testimony of the accomplice which, in turn and to the same extent, corroborates the confessions."). Although there are some discrepancies between the two men's testimony, that does not preclude a finding of corroboration. On the key issues, the two testimonies are consistent with each other. It is for the jury to weigh the credibility of the witnesses in making their determination if the corroboration is sufficient. That occurred in this case.

We are simply unable to conclude that the accomplice testimony by Mr. Hegman or the testimony by Mr. Jones regarding the defendant's confession was not corroborated. Both men's testimony placed the defendant inside the victim's apartment during the time of the murder and referenced an altercation taking place between the two, as well as Victor Johnson. Both reference a robbery of the victim of goods which the defendant was later found in possession of. Even were we to assume that the separate testimonies could not serve to corroborate the other, other copious evidence in the record leads to the conclusion that the standard was met in this case.

Mr. Hegman's testimony was further corroborated by the cell phone records placing the group in the area at the time of the murder and robbery. Moreover, the defendant's possession of the stolen electronics and subsequent pawning of them corroborate his involvement, as does the testimony of Ms. Poynter and the pawn shop employees. Mr. Hegman also testified that after he left the apartment, Mr. Johnson went to the dumpster area. Investigators found several of the victim's personal items in the dumpster.

The same corroboration also serves to corroborate the statements made by the defendant to Mr. Jones. In the statement, the defendant indicated that electronics had been taken and that he later pawned them locally. The cell phone records again corroborate that a call was made to the victim prior to the group's arrival and that the group was in the area at the time, verifying the statements made by the defendant. Moreover, the autopsy report and subsequent finding that the cause of death was "asphyxia by strangulation" is corroborated by the defendant's statement that he "choked [the victim] out." In essence, the defendant has knowledge of the details of the murder, *i.e.,* the cause of death. Plus, the defendant's own letters written and calls made to his wife or other gang members contained statements which would serve to corroborate portions of the testimony. Clearly, the statement that they would never have gotten caught had Mr. Johnson not taken the cell phone indicates guilt and a knowledge of the crime. Other statements made in the letters do as well.

Based upon this, we can give no credence to the defendant's argument. His convictions did not rest solely on the uncorroborated testimony of accomplice Hegman or the

testimony by Mr. Jones. While the defendant asserts their lack of credibility, that argument ignores that the witnesses were placed before the jury and offered their testimony. They were subject to vigorous cross-examination. The jury was responsible for making any necessary credibility determinations. No relief is warranted.

## B. Sufficiency of the Evidence

As noted, the defendant's main argument focuses upon the corroboration requirements of the accomplice testimony and the confession. He asks us to review the sufficiency of the evidence ignoring the testimony of Mr. Hegman and Mr. Jones. However, as previously noted, both were sufficiently corroborated and warrant inclusion in our consideration of the evidence. The defendant makes no other argument with regard to sufficiency which is separate from the corroboration requirements. Nonetheless, we will perform a general sufficiency review of the convictions.

When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Dorantes*, 331 S.W.3d 370, 379 (2011); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[O]n appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Dorantes*, 331 S.W.3d at 379 (internal quotation omitted). It is the trier of fact who resolves all questions of witness credibility, the weight and value of the evidence, as well as all factual issues raised by the evidence. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Reviewing courts should neither re-weigh the evidence nor substitute their own inferences for those drawn by the jury. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003).

The trial court's approval of the jury's verdict accredits the State's witnesses and resolves all conflicts in the evidence in the State's favor. *State v. Moats*, 906 S.W.2d 431, 433-34 (Tenn. 1995). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." *State v. Thacker*, 164 S.W.3d 208, 221 (Tenn. 2005). These rules apply whether the verdict is predicated upon direct evidence, circumstantial evidence, or a combination of both. *Dorantes*, 331 S.W.3d at 379. In weighing the sufficiency of the evidence, circumstantial and direct evidence are treated the same, and the State is not required to exclude every reasonable hypothesis other than that of guilt. *Id*. at 381.

The defendant was convicted in the alternative of first degree premeditated murder and first degree felony murder. As required by law, after conviction, the trial court merged the

multiple murder convictions involving a single victim. *See State v. Kiser*, 284 S.W.3d 227. 234 (Tenn. 2009). However, it is unclear from the judgments how the counts were merged. A notation on judgment of conviction for Count 2, first degree premeditated murder, states: "Counts 1 and 2 merge into one count of 1st degree murder." From that it is unclear what the trial court's intent was as to the merger, *i.e.*, which conviction was merged into the other. As such, we remand for entry of corrected judgments reflecting the appropriate information.

Regardless, as pointed out by the State, despite merger neither conviction was extinguished. *See State v. Adam Clyde Braseel*, No. M2009-00839-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 784, *23 (Tenn. Crim. App. Sept. 17, 2010). The convictions simply merged into a single judgment of conviction. In this situation, review of all convictions is appropriate.

### 1. Premeditated Murder

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2010). A premeditated killing is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). The element of premeditation is a question of fact for the jury. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). In *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

Additional factors from which a jury may infer premeditation include lack a provocation by the victim and the defendant's failure to render aid to the victim. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

Viewing the evidence in the light most favorable to the State, we conclude that the evidence is sufficient to support the conviction. According to Mr. Jones, the defendant told him that the group traveled to the victim's apartment in order to rob him. During the course of that robbery, the victim was killed. According to the defendant's statements to Mr. Jones,

the group rushed the front door, wrestled with the victim, and the defendant "choked him out." The group, at least the defendant and Mr. Johnson, barreled their way through the door and immediately began attacking the unarmed victim, who had been expecting them to work on music. The group then left in stages, taking time to take many of the defendant's personal items to the trash can. The defendant later pawned multiple items which had been taken from the victim's apartment.

Although not conclusive, the jury was entitled to infer that, because of the preplanned robbery and the manner in which the group entered the apartment, the acts which took place were premeditated. The medical examine was clear that it took minutes, not seconds, for death to result under these circumstances. This action was taken after the victim had already been beaten with a frying pan by Mr. Johnson. Testimony was also given that a possible motive for the attack and murder was because the defendant and Mr. Johnson were offended because the victim was wearing rival gang colors, although no testimony was ever introduced that the victim was actually in a gang. Testimony was elicited at trial that one way to increase rank within the gang was to commit certain crimes. Again, the jury was free to infer from these circumstances, as well as the defendant's later statement to Mr. Jones that he earned his "status" after these events, that the course of events was planned.

### 2. Felony Murder

A person commits first degree felony murder when he recklessly kills another in the perpetration or attempt to perpetrate several enumerated felonies, one of which is robbery. T.C.A. § 39-13-202(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the victim in fear." T.C.A. § 39-13-401(a). A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense. T.C.A. § 39-11-402(2).

After review of the record in the light most favorable to the State, we must conclude that the evidence is sufficient to allow a rational trier of fact to conclude that the defendant, while engaged in a robbery, did strangle the victim to death. By the defendant's own statement, testified to by Mr. Jones, he "choked" the victim out, a fact which was established by the medical examiner's report as well. Mr. Hegman testified that while he was present in the apartment, he saw the defendant "reaching" for the victim. While the record indicates that it was Mr. Johnson who hit the defendant with the frying pan, the cause of death was asphyxia by strangulation, and choking someone would be consistent with that cause of death, as well as the bruising on the victim's neck and the hemorrhages in his eyes. Regardless, under a theory of criminal responsibility, each would be responsible for the actions of the other.

-15-

The evidence in the record established that the men went to the victim's apartment and proceeded to rob and kill the victim. The defendant told Mr. Jones that the group had gone there to rob the victim, although Mr. Hegman testified that he was not aware of that plan. However, he did witness both the defendant and Mr. Johnson in an altercation with the victim and later learned that the victim had died. Mr. Hegman himself admitted that he removed a plastic tub of the victim's belongings from the apartment at Mr. Johnson's direction. He also testified that he was with the defendant later when the defendant pawned some of the victim's electronics which had been taken from the apartment. Other testimony established that the electronics were in fact the victim's and that the defendant was the one who took them to the pawn shop.

Taken together as a whole, the evidence is more than sufficient to establish that the defendant was guilty of felony murder during the perpetration of a robbery. He is entitled to no relief.

### 3. Especially Aggravated Robbery

As an initial issue with regard to the conviction for especially aggravated robbery, the State contends that the defendant has waived review. The State points out that, within his appellate brief, the defendant mentions this conviction "passingly and only within the statement of the case." The State also points out that the defendant failed to include any citation to relevant statutes for murder or robbery, but argues that the focus of the brief is clearly on the murder conviction. In support of its waiver argument, the State points our attention to a line of cases in which this court has repeatedly declined to review the sufficiency of the evidence for convictions which were not clearly contested in the appellate brief. *See e.g. State v. Keither A. Whited*, No. M2010-001340CCA-R3-CD , 2010 Tenn. Crim. App. LEXIS 981, *16-17 n.6 (Tenn. Crim. App. Nov. 19, 2010).

While we do agree with the State that the defendant is very ambiguous in his brief with regard to the actual convictions he is challenging, there is, nonetheless, some reference made to both the robbery and murder convictions. As such, in the interest of finality and completeness, we elect to review all convictions for the sufficiency of the evidence.

A person is guilty of especially aggravated robbery when he accomplishes a robbery with a deadly weapon and when the victim suffers serious bodily injury. T.C.A. § 39-13-403. A person is guilty of robbery when he commits an intentional or knowing theft of property from the person of another by violence or putting the person in fear. T.C.A. § 39-13-4010. A deadly weapon is any weapon or instrument which, from the manner in which it is used or attempted to be used, is likely to produce death or cause great bodily injury. T.C.A. § 39-11-106(5). A person is criminally responsible for an offense committed by the conduct of

another if, acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense. T.C.A. § 39-11-402(2).

Again, review of the record establishes that the men went to the apartment in order to rob the victim and did in fact do so. In the process, the victim was killed. The evidence establishes that the men burst through the door and began an assault upon the victim. Eventually he was beat on the head multiple times with a frying pan, a deadly weapon, before being choked to death by the defendant. Multiple pieces of evidence establish that items belonging to the victim were taken from the apartment and later pawned for cash by the defendant. This, in the light most favorable to the State, is sufficient to establish the crime of especially aggravated robbery.

## CONCLUSION

Based upon the foregoing, the judgments of conviction are affirmed. However, the case is remanded to the trial court for entry of corrected judgments reflecting which murder conviction the court intended to merge.

_____

JOHN EVERETT WILLIAMS, JUDGE